IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 3:25-cv-00121 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| JOSEPH G. RASHID, CANDA RASHID, | ) | |
| RASHID PHARMACY P.L.C., and | ) | |
| RASHID DELIVERY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY OF THE ACTION

1.     This is an action for treble damages and civil penalties under the False
Claims Act (hereinafter "FCA"), 31 U.S.C. §§ 3729 – 3732, damages and penalties
under the Controlled Substances Act (hereinafter "CSA"), 21 U.S.C. § 842, as well as
damages under the common law.

2.     Defendant Joseph G. Rashid (hereinafter "Rashid") owned and operated
both a retail and long-term care pharmacy and related businesses in the Fort
Madison area from at least 1997 until at least 2021, if not the present.  These
included, but were not limited to, Rashid Delivery LLC, Rashid Long Term Care
Pharmacy, Rashid Pharmacy P.L.C., JRx Pharmacy Services, and JJ Real Estate.

3.     Rashid's operating of his pharmacy generated a surplus of prescribed
controlled substances that he could not lawfully dispense to patients.  Rashid failed
to dispose of these controlled substances as required by federal law.  Instead, he

created false "destruction logs" claiming the drugs had been destroyed when, in fact, they were being improperly stored in his personal office.

4.      Rashid and his wife, Defendant Canda Rashid (hereinafter "Canda"), further received COVID "Paycheck Protection Program" (hereinafter "PPP") loans for his pharmacy and related businesses and received COVID "Provider Relief Fund" (hereinafter "PRF") payments.  But, rather than use those funds for their lawfully provided purposes, they immediately deposited the proceeds into Rashid's personal account with TD Ameritrade, and Rashid proceeded to engage in large-scale day trading transactions during the pandemic; then he knowingly and inaccurately certified that he used the funds for their lawful purposes.

5.      Rashid's actions individually and through his businesses constitute fraud and recordkeeping, reporting, and notice violations regarding controlled substances.  Plaintiff seeks to recover the amounts of fraudulent funds paid as a result of false claims made or caused to be made by Rashid and Canda individually and through their businesses, trebled, plus penalties, in addition to statutory penalties for the violations of the CSA.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States of America is a Plaintiff.  In addition, this Court has subject matter jurisdiction over the FCA causes of action under 28 U.S.C. § 1331 and subject matter jurisdiction over the CSA causes of action under 21 U.S.C.

§ 842 and supplemental jurisdiction over the common law causes of action, under 28 U.S.C. § 1367(a).

7.    This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, transact business in and have committed the alleged acts in the Southern District of Iowa.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and transact business in the Southern District of Iowa, and the alleged acts occurred in this District.

## **PARTIES**

9.    The Plaintiff in this action is the United States of America, suing on behalf of the United States Small Business Administration ("SBA") and the United States Department of Health and Human Services ("HHS").

10.    Joseph G. Rashid is an individual who resides in or around Fort Madison, Iowa, and who at all relevant times owned and operated or otherwise was the principal decision-maker for Rashid Pharmacy P.L.C. and the related entities described herein.  Rashid was an Iowa-licensed pharmacist and at all relevant times was registered as a practitioner by the Drug Enforcement Administration (hereinafter "DEA").

11.    Canda Rashid is an individual who resides in or around Fort Madison, Iowa; is Joseph Rashid's wife; and had at least signature authority for Rashid Delivery LLC.

12.    Rashid Pharmacy P.L.C. was formed in March 2002 and remains an active registered business entity in the state of Iowa.

13.    Rashid Pharmacy P.L.C. operated both a retail and a long-term care pharmacy out of the same building at 2404 Avenue L in Fort Madison, Iowa.  Either the retail or long-term care pharmacy or both may be referred to as Rashid Pharmacy. Both pharmacies were Iowa-licensed pharmacies, and both pharmacies at all relevant times were registered by the DEA.

14.    Upon information and belief, even though Rashid Pharmacy P.L.C. is still an active Iowa corporation, it does not currently own or operate Rashid Pharmacy and has not since Rashid Pharmacy was sold in 2021; however, as further outlined below, Rashid is still an active participant in the "new" business.

15.    Rashid Pharmacy previously operated out of the same registered location as Rashid Pharmacy P.C., and Rashid Drugs P.C.  Rashid Drugs, P.C. was the earliest registered corporate entity; it was registered as a corporation on July 3, 1997.

16.    Upon information and belief, Rashid Pharmacy has operated as a pharmacy in the Fort Madison community since 1997 until it was sold in 2021.

17.    Rashid Pharmacy was formed, owned, and principally operated by Joseph Rashid until he sold the pharmacy sometime in 2021.

18.    Rashid Delivery LLC was registered as a corporation on August 24, 2012, and its purpose was to deliver prescriptions from the long-term care pharmacy to patients at long-term care facilities.

19.    Upon information and belief, Joseph Rashid sold Rashid Pharmacy sometime in 2021 to Tom Nelson, who previously managed the pharmacy under Rashid's ownership.

20.    Upon information and belief, Nelson Family Pharmacy is the name of the Iowa registered corporation that owns and operates the pharmacy at the same location as Rashid Pharmacy, prior to the sale of Rashid Pharmacy.

21.    Upon information and belief, Rashid still participates in the operation of Nelson Family Pharmacy; and he remains the registered agent of the still-active Rashid Pharmacy P.L.C.

22.    Rashid Pharmacy's retail business dispensed prescription drugs to customers, sold over-the-counter medicines, medical equipment, food and snacks, drinks, personal hygiene items, vitamins and nutrition supplements, basic home supplies, and other items commonly sold by drug stores.  Some of its retail customers were recipients of state and/or federal health-care benefits like Medicaid or Medicare; others paid cash or had private insurance.

23.    Rashid Pharmacy's long-term care pharmacy dispensed prescription drugs to residents of long-term-care facilities across the state of Iowa.  Most of these residents were elderly and Medicare beneficiaries.

## LEGAL BACKGROUND

### I.    The False Claims Act

24.    Originally enacted in 1863, the False Claims Act (hereinafter "FCA") was substantially amended in 1986 by the False Claims Amendments Act.  The 1986

amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

25.    The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of at least $14,308.00 and up to $28,619.00 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. § 3729(a), 20 C.F.R. Part 356 and 28 C.F.R. Part 85 (*see* 90 FR 29445, July 3, 2025).

26.    The FCA defines the terms "knowing" and "knowingly" to mean that a person (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) acts "in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  The statute provides that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b)(1)(B).

27.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . ." 31 U.S.C. § 3729(b)(2)(A).

28.    In this action, and under well-established precedent, the false and fraudulent nature of Defendants' conduct is informed or measured by their violation of, or failure to comply with, certain statutes and regulations material to the submission of applications for government-subsidized and/or issued loans and funds.

## II.    CARES Act – Provider Relief Fund

29.    The Coronavirus, Aid, Relief and Economic Security Act ("CARES Act") was a federal law enacted in or around March 2020 and designed to provide emergency assistance to the millions of Americans suffering due to the COVID-19 pandemic.

30.    Through the CARES Act, Congress appropriated moneys (through the Provider Relief Fund, hereinafter referred to as "PRF") to be disbursed by HHS to reimburse eligible health care providers ("Providers") for their expenses and lost

revenues attributable to COVID-19.  HHS, through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the PRF.

31.    HRSA distributed PRF dollars to Providers in Phases.  In order to rapidly provide funding to Providers during the pandemic, HRSA distributed the first Phase of payments under the CARES Act PRF to Providers who (a) billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019; (b) were not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; (c) were not currently excluded from participation in Medicare, Medicaid, or other Federal health care programs; and (d) did not currently have Medicare billing privileges revoked.  Providers meeting these criteria automatically received a PRF Payment calculated from Medicare billing and did not have to apply for the funding, but were required to attest to and comply with the Terms and Conditions of the PRF if they retained such funding.  In later Phases, Providers had to submit applications to receive PRF payments.

32.    PRF recipients could attest to their compliance with the program Terms and Conditions in one of two ways.  First, PRF recipients were notified that they could submit an attestation through an online portal confirming receipt of the funds and agreeing to the Terms and Conditions of the payment.  Alternatively, recipients were notified that if they kept the money for a period that exceeded 90 days from receipt, they were deemed to have accepted the Terms and Conditions of the PRF.

33.    Providers who attested (actively or passively) to the Terms and Conditions acknowledged that their commitment to full compliance with the Terms

and Conditions was material to the HHS Secretary's decision to disburse PRF Payments to them. Providers further acknowledged that non-compliance with any Term or Condition could cause the HHS Secretary to recoup some or all of the Payment.

34.     Providers who attested to the Terms and Conditions also certified that the Payment would only be used to prevent, prepare for, and respond to the coronavirus, and that the Payment would reimburse the recipient only for health care related expenses or lost revenues that were attributable to the coronavirus.

35.     Providers who attested to the Terms and Conditions also certified that all information provided relating to the Payment was true, accurate, and complete and that any deliberate omission, misrepresentation, or falsification of any information was punishable by civil or criminal penalties.

36.     Providers who attested to the Terms and Conditions also certified that they would maintain appropriate records and cost documentation to substantiate the reimbursement of costs under the disbursement.

III.    **CARES Act – Paycheck Protection Program ("PPP") Loans**

37.     As noted above, on March 27, 2020, the CARES Act became law and provided emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). The program was modified and extended thereafter.

38.    To obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.  In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to provide, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation confirming their payroll expenses.

39.    A PPP loan application was processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies.  While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted to the SBA in the course of processing the loan and subsequent forgiveness process.

40.    PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the

business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

41.    The application process to obtain a PPP loan required the eligible recipient to make the following good faith certifications and acknowledgments:

a.    That the applicant was eligible to receive a PPP loan under the rules in effect at the time the application was submitted (the "PPP Rules");

b.    That the uncertainty of current economic conditions made the loan request necessary to support the ongoing operations of the eligible recipient;

c.    That the applicant was in operation on February 15, 2020, had not permanently closed, and was either an eligible self-employed individual independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contracts, as reported on Form(s) 1099-MISC;

d.    That the funds would be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the PPP Rules;

e.    That if the funds were knowingly used for unauthorized purposes, the federal government may find the individual legally liable for such charges as fraud;

f.    That not more than 40% of the loan proceeds may be used for non-payroll costs;

g.    That documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities would be provided to the lender if required;

h.    That the eligible recipient had not received and would not receive another loan under the PPP;

i.    That the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects;

      j.  That the applicant understood that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. §§ 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. § 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000; and

      k.  That the lender would confirm the eligible loan amount using the documents submitted by the application.

42.    Once the borrower submitted its PPP loan application to a lender, the participating lender processed the PPP loan application.  If a PPP loan application was approved by the participating lender, it thereafter funded the PPP loan using its own monies, which were 100% guaranteed by the SBA.

43.    Qualifying borrowers who exhausted the entirety of their first PPP loan on authorized uses were permitted to apply for a second-draw PPP loan.  Like first-draw PPP loans, second-draw loans were calculated based on the applicant's average monthly payroll costs.  As part of their second-draw applications, applicants were required to make affirmative certifications similar to those set forth above.

44.    Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive for both first-draw and second-draw loans was determined by the number of employees employed by the business and their average payroll costs.  Any employee salary in excess of $100,000 annually was excluded from the calculation. Businesses applying for a PPP loan had to provide documentation to confirm that they had in the past paid employees the compensation represented in the loan application.

45.    After the lender processed and approved a borrower's PPP loan application, the lender submitted to the SBA the "Lender's Application – Paycheck Protection Program Loan Guaranty" applying for a guarantee on the loan.  In that application, the lender certified that the borrower had made the required certifications regarding its eligibility.  Therefore, if a borrower made misrepresentations on its PPP loan application, the borrower's false certifications caused the lender to submit a loan guarantee application to the SBA that contained the borrower's false statements.

46.    The SBA provided for forgiveness of first-draw and second-draw PPP loans.  In order to receive forgiveness, borrowers were required to submit signed loan forgiveness applications and documents containing the information and certifications in SBA Form 3508, 3508EZ, or a third-party lender equivalent.  The PPP loan forgiveness application required the business (through its authorized representative) to make certain other certifications in order to be eligible to obtain forgiveness for a PPP loan.

47.    For example, applicants for PPP loan forgiveness were required to certify in their PPP loan forgiveness applications, among other things, that:

- "The dollar amount for which forgiveness is requested . . . was used to pay business costs that are eligible for forgiveness";

- "The Borrower did not reduce salaries or hourly wages of any employee by more than 25 percent during the Covered Period compared to the most recent quarter before the Covered Period.  For purposes of this certification, the term 'employee' includes only those employees that did not receive, during any single period during 2019, wages or salary at an annualized rate of pay in an amount more than $100,000";

- "[I]f the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges";

- "The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness"; and

- "The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

## IV.    The Controlled Substances Act

48.    The CSA, together with its implementing regulations, 21 C.F.R. Part 1301, *et seq.*, operates as the United States' primary legal tool for preventing the diversion of prescription drugs from legitimate users into illicit drug traffic.  To deter drug diversion, the CSA establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substances except in a manner authorized by the statute.  *See* 21 U.S.C. § 841(a).  As part of this closed regulatory system, the Act sets forth, *inter alia*, comprehensive prescribing and record-keeping requirements, violations of which may result in criminal and/or civil penalties.

49.    The CSA categorizes controlled substances according to five schedules. 21 U.S.C. § 812.  The statute sets forth the initial controlled substance schedules, but also authorizes the Attorney General to promulgate regulations as necessary to update and/or amend the five schedules.  *Id.* § 811.

50.    Schedule I consists of drugs or other substances with a high potential for abuse that currently lack any accepted medical use.  21 U.S.C. § 812(b)(1); 21 C.F.R. § 1308.11.

14

51.    Schedule II consists of drugs or other substances that have legitimate medical uses, but also have a high potential for abuse and, when abused, may lead to severe psychological or physical dependence.   21 U.S.C. § 812(b)(2), 21 C.F.R. § 1308.12.

52.    Schedule III consists of drugs or other substances that have legitimate medical uses and less potential for abuse than Schedule II controlled substances, but that have some potential for abuse and, when abused, may cause some psychological or physical dependence.  21 U.S.C. § 812(b)(3), 21 C.F.R. § 1308.13.

53.    Schedule IV consists of drugs or other substances that have legitimate medical uses and less potential for abuse than Schedule III controlled substances, but that have some potential for abuse and, when abused, may cause some psychological or physical dependence.  21 U.S.C. § 812(b)(4), 21 C.F.R. § 1308.14.

54.    Schedule V consists of drugs or other substances that have legitimate medical uses and less potential for abuse than Schedule IV controlled substances, but that have some potential for abuse and, when abused, may cause some psychological or physical dependence.  21 U.S.C. § 812(b)(5); 21 C.F.R. § 1308.15.

55.    The CSA requires individuals who dispense controlled substances to obtain a registration from the DEA.   21 U.S.C. § 822(a)(2).   DEA registrants, including practitioners such as medical doctors and pharmacists, may only dispense controlled substances "to the extent authorized by the registration and in conformity with" the CSA.  *Id.* § 822(b).

56.    The CSA's record-keeping requirements play a critical role in reducing drug diversion, allowing both the DEA and the DEA registrant to monitor and track the distribution and dispensing of controlled substances.    *See United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996) ("The statutory scheme envisioned by the [CSA] is one of control through record keeping.") (citation omitted).    The Act requires any practitioner engaged in dispensing controlled substances to, *inter alia*:

a.    make a complete and accurate record of all controlled substances received, sold, delivered, otherwise disposed of, and stocks on hand 21 U.S.C. § 827(a)(1), (a)(3) and 21 C.F.R. §§ 1304.04, 1304.11, 1304.21, 1304.22.

57.    The CSA requires complete and accurate records reflecting the quantities of each controlled substance disposed of at any given time.    21 U.S.C. § 827(a)(3).    Accordingly, a violation of the Act occurs each time the Government can prove discrepancies in the records.

58.    Any person who refuses or negligently fails to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required by the CSA or its implementing regulations is subject to monetary civil penalties per violation.    21 U.S.C. § 842(a)(5), 842(c)(1)(B)(i); 28 C.F.R. § 85.5.

## **FACTS**

### Facts related to the COVID PPP loans and PRF.

59.    On or about April 13, 2020, Rashid Pharmacy received a PPP loan for $462,300, and Rashid Delivery received a PPP loan for $118,000.    The PPP loans had been requested, via application, on April 3, 2020.

60.    Rashid ultimately sought and benefitted from both loans; however, the Rashid Delivery loan application had his initials crossed out next to certifications on the loan application, replaced by Canda's initials, and she ultimately signed for Rashid Delivery's loan.

61.    Both Rashid Pharmacy's and Rashid Delivery's loans were funded, and the proceeds were deposited into Rashid's personal bank account at Connection Bank on or about April 13, 2020.

62.    Before receiving the PPP loans, Rashid's personal bank account at Connection Bank had a balance of approximately $74,000. After receiving the PPP loan proceeds, it had a balance of approximately $675,000.

63.    Between April 14, 2020, and April 16, 2020, the immediate three days after receiving the PPP loan proceeds, Rashid electronically transferred $625,000 in three transactions of $250,000, $250,000, and $125,000 to his personal TD Ameritrade investment account.

64.    At no point did the loan proceeds go to a business account for either Rashid Pharmacy or Rashid Delivery.

65.    On or about June 13, 2020, Rashid Pharmacy received a Portal 1 payment of $407,186.49 in PRF funds, to the business checking account, with Rashid Pharmacy completing an active attestation of the Terms and Conditions on June 15, 2020. This included, at least in part, a certification that the funds "will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall

reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus."

66. Rashid then transferred $500,000 from his business checking account to his personal checking account in two, $250,000 transfers on or about June 16 and 17, 2020.

67. Rashid then transferred $500,000 from his personal checking account to his personal TD Ameritrade investment account in two, $250,000 transfers on or about June 16 and 17, 2020.

68. Rashid then used these funds — along with the PPP loan proceeds he previously transferred into this account — to engage in large volume securities purchases in the calendar year 2020 (a practice colloquially referred to as "day trading") in addition to paying taxes, bills, and checks written on the account.

69. On June 30, 2021, Rashid sought, and later obtained, forgiveness for $430,661 of the $462,300 PPP loan received by Rashid Pharmacy. On December 12, 2020, Rashid sought, and later obtained, forgiveness for all $118,000 of the PPP loan received by Rashid Delivery. In doing so, Rashid certified on each application, *inter alia*, the following:

- The loan proceeds were used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures); and

- At least 60% of the forgiveness amount was for payroll costs; and

- That the federal government could pursue recovery of loan amounts, including civil or criminal fraud charges, for funds knowingly used for unauthorized purposes.

70.    The SBA would not have forgiven Rashid Pharmacy's or Rashid Delivery's PPP loans if it knew that Rashid utilized the loan proceeds exclusively for personal purposes, principally day trading.  Day trading is not a permissible use of PPP funds.

71.    The SBA relied upon Rashid's, Rashid Pharmacy's, and Rashid Delivery's representations and certifications in forgiving Rashid Pharmacy's and Rashid Delivery's PPP loans.

72.    Lenders were required to repay PPP loan proceeds that were not forgiven with interest, albeit a very low interest rate.

73.    Rashid engaged an accountant to submit documentation regarding his PRF payment.  Rashid, through his accountant, certified that he used the PRF payment from Quarter 2 in 2020 through Quarter 2 in 2021 for general and administrative expense and healthcare-related expenses.  Rashid, through his accountant, further agreed that the PRF payments "helped to make the changes needed to operate during the pandemic (e.g., by acquiring PPE, creating temporary facilities, providing for virtual visits, etc.)."  These attestations were false.

74.    As a consequence of this certification, Rashid Pharmacy did not have to repay any of the PRF payment.

75.     The accountant relied exclusively on Rashid's representations and the documentation Rashid submitted to the accountant in submitting the PRF reporting information.

76.     Had the accountant known that Rashid used the PRF payment for high-volume day trading, the accountant would not have submitted the PRF reporting on Rashid's behalf, as day trading is not an approved use for PRF funds.

<u>Facts related to Rashid's CSA violations.</u>

77.     Joseph Rashid, as a pharmacist, and Rashid Pharmacy were, at all times relevant to this lawsuit, registered to dispense controlled substances under federal and state law.

78.     Federal law requires expired controlled substances to be destroyed by the pharmacy. *See* 21 C.F.R. § 1317.05 (Registrant disposal [of controlled substances]).

79.     Federal regulation provides for four ways for a pharmacist like Rashid and pharmacies like Rashid Pharmacy to destroy controlled substances:

(a)  Practitioner inventory. Any registered practitioner in lawful possession of a controlled substance in its inventory that desires to dispose of that substance shall do so in one of the following ways:

    (1)  Promptly destroy that controlled substance in accordance with subpart C of this part using an on-site method of destruction;

    (2)  Promptly deliver that controlled substance to a reverse distributor's registered location by common or contract carrier pick-up or by reverse distributor pick-up at the registrant's registered location;

(3)  For the purpose of return or recall, promptly deliver that controlled substance by common or contract carrier pick-up or pick-up by other registrants at the registrant's registered location to: The registered person from whom it was obtained, the registered manufacturer of the substance, or another registrant authorized by the manufacturer to accept returns or recalls on the manufacturer's behalf; or

(4)  Request assistance from the Special Agent in Charge of the Administration in the area in which the practitioner is located.

    (i)  The request shall be made by submitting one copy of the DEA Form 41 to the Special Agent in Charge in the practitioner's area. The DEA Form 41 shall list the controlled substance or substances which the registrant desires to dispose.

    (ii)  The Special Agent in Charge shall instruct the registrant to dispose of the controlled substance in one of the following manners:

        (A)  By transfer to a registrant authorized to transport or destroy the substance;

        (B)  By delivery to an agent of the Administration or to the nearest office of the Administration; or

        (C)  By destruction in the presence of an agent of the Administration or other authorized person.

80.   The most common way to destroy a controlled substance is to give it to a "reverse distributor," a licensed entity authorized to collect and destroy controlled substances. *See* 21 C.F.R. § 1317.05(a)(2) (quoted above). Reverse distributors charge a fee for their services; using them would have cost Rashid's pharmacy money.

81.   Pharmacies may also destroy controlled substances themselves by rendering them unusable and "non-retrievable" (*see* 21 C.F.R. § 1317.90 (methods of destruction [of controlled substances]); this destruction process requires the

participation of multiple people because it must be witnessed (*see* 21 C.F.R. § 1317.95(c), (d) (destruction procedures [of controlled substances]).

82.     However, a pharmacy elects to destroy its controlled substances, federal law requires careful completing of a form required by the Drug Enforcement Administration ("DEA") known as DEA Form 41.  21 C.F.R. § 1317.05(a)(4)(i).

83.     On March 30, 2021, law enforcement officials executed a federal search warrant at Rashid Pharmacy.  In executing that search warrant, law enforcement found trash bags, Ziploc baggies, cardboard boxes, unlabeled pill bottles, partially used blister packs, and loose opioid and other pills, vials, and other controlled substances in Rashid's personal office space.

84.     Upon execution of the search warrant, numerous blister packs were found with several pills missing.

85.     Some of the controlled substances were still in blister packs or vials or bottles with their original prescription labels dating as far back as 2013.

86.     Some of the unlabeled bottles were found with varying amounts of opioid or other controlled substance pills; some with as few as a single pill.

87.     Ziploc baggies with differing numbers of syringes of controlled substances were also found in Rashid's personal office space.

88.     Opioid or other controlled substance pills were also found loose in Rashid's personal office space; some appeared to be crushed.

89.     No completed DEA Form 41s were recovered in the government's execution of the search warrant at Rashid Pharmacy, and the relevant regional DEA

office did not receive completed Form 41s from Rashid Pharmacy at all times relevant to this lawsuit.

90. However, what law enforcement did find were homemade destruction logs which purported to include names, quantities, and dates of destruction for expired, surrendered, or otherwise unusable controlled substances. Rashid signed some of these homemade destruction logs, affirming the drugs were destroyed. However, entries on the destruction log matched drugs found improperly stored during the search warrant.

91. Specifically, investigators located the following entries on the destruction logs, which Rashid certified he destroyed, but located the drugs (undestroyed) in Rashid's personal office during the search warrant:

    a.   RX# 2060714 (5 milligram oxycodone HCL), prescribed to P.M.;

    b.   RX# 2060521 (5 milligram oxycodone HCL), prescribed to C.S.;

    c.   RX# 2060548 (5 milligram oxycodone HCL), prescribed to L.H.;

    d.   RX# 2060677 (5 milligram oxycodone HCL), prescribed to F.Z.;

    e.   RX# 2061753 (5/325 hydrocodone-acetaminophen), prescribed to H.T.;

    f.   RX# 2060955 (oxycodone HCL), prescribed to K.F.;

    g.   RX# 2061046 (10/325 hydrocodone-acetaminophen), prescribed to R.M.;

    h.   RX# 2061316 (5 milligram oxycodone HCL), prescribed to L.L.;

    i.   RX# 2061032 (20 milligram oxycontin), prescribed to M.K.;

    j.   RX# 2061040 (5/325 hydrocodone-acetaminophen), prescribed to M.C.;

k.   RX# 2061116 (5 milligram oxycodone HCL), prescribed to M.M.;

l.   RX# 2061666 (2 milligram hydromorphone), prescribed to M.M.;

m.   RX# 2061593 (2 milligram hydromorphone), prescribed to M.M.;

n.   RX# 2061266 (5/235 hydrocodone-acetaminophen), prescribed to A.L.;

o.   RX# 2061067 (7.5/325 hydrocodone-acetaminophen), prescribed to P.F.;

p.   RX# 2061513 (5/325 hydrocodone-acetaminophen), prescribed to T.M.;

q.   RX# 2061235 (5 milligram oxycodone HCL), prescribed to R.B.;

r.   RX# 2061287 (5/325 hydrocodone-acetaminophen), prescribed to A.S.;

s.   RX# 2061312 (10/325 hydrocodone-acetaminophen), prescribed to M.O.;

t.   RX# 2061288 (5/325 hydrocodone-acetaminophen), prescribed to M.M.;

u.   RX# 2061323 (5/325 hydrocodone-acetaminophen), prescribed to S.J.;

v.   RX# 2061295 (5 milligram oxycodone HCL), prescribed to J.H.;

w.   RX# 2061341 (10/325 hydrocodone-acetaminophen), prescribed to J.H.;

x.   RX# 2061695 (5/325 hydrocodone-acetaminophen), prescribed to K.D.;

y.   RX# 2061324 (5/325 oxycodone-acetaminophen), prescribed to L.B.;

z.   RX# 2061360 (10/325 hydrocodone-acetaminophen), prescribed to D.C.;

aa.   RX# 2062123 (5 milligram oxycodone HCL), prescribed to D.C.;

bb.   RX# 2061467 (5 milligram oxycodone HCL), prescribed to M.D.;

cc.   RX# 2062094 (5/325 hydrocodone-acetaminophen), prescribed to J.H.;

dd.   RX# 2061372 (5/325 hydrocodone-acetaminophen), prescribed to J.K.;

ee.   RX# 2061551 (30 milligram morphine sulfate), prescribed to D.M.;

ff.   RX# 2061765 (5/325 hydrocodone-acetaminophen), prescribed to A.M.; and

gg.   RX# 2062150 (5/325 hydrocodone-acetaminophen), prescribed to R.B.

92.    Instead of complying with federal law regarding the destruction of controlled substances, Rashid had the manager of his narcotics room, Frankie Munoz, place expired narcotics in cardboard boxes in the narcotics room and then complete Rashid's homemade "destruction log" by filling in information about the controlled substances he was placing in the box.

93.    Rashid's homemade destruction log was not a form promulgated by the DEA, and Munoz's inputting information on that form did not satisfy federal law.

94.    Rashid then signed the destruction log, affirming the drugs had been destroyed, and removed the narcotics from his pharmacy's narcotics room to his office space where he retained them, rather than destroying them in a manner provided for by federal law, and as he affirmed on his destruction log.

<u>**CLAIMS FOR RELIEF**</u>

**COUNTS 1 & 2**
**Violation of 31 U.S.C. § 3729(a)(1)(A)**
**(Presenting or Causing to be Presented False and Fraudulent Claims)**

95.     The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

96.     On or about April 3, 2020, and April 13, 2020, Defendants Joseph Rashid and Rashid Pharmacy knowingly requested and obtained a PPP loan and used the funds for an unapproved purpose, in violation of the PPP Rules.

97.     On or about June 30, 2021, Defendants Joseph Rashid and Rashid Pharmacy knowingly requested and received forgiveness for this PPP loan despite their failure to comply with the PPP Rules.

98.     Rashid and Rashid Pharmacy presented two false claims to the United States, through its agency the SBA, for payment: its initial loan application for PPP loan proceeds and its loan forgiveness application to avoid repayment of the PPP loan proceeds.

99.     Specifically, on the initial loan application, they falsely certified the following:

CERTIFICATIONS
The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

JR     Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.
JR     The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

100.   Specifically, on the loan forgiveness application, Rashid and Rashid Pharmacy falsely certified the following:

> The dollar amount for which forgiveness is requested (which does not exceed the principal amount of the PPP loan):
> - was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures);
> - includes payroll costs equal to at least 60% of the forgiveness amount;  and
> - for any owner-employee (with an ownership stake of 5% or more) or self-employed individual/general partner, does not exceed 2.5 months' worth of compensation received during the year used to calculate the PPP loan amount, capped at $20,833 per individual in total across all businesses.

101.   By virtue of these false claims, the United States was damaged for the full amount of the PPP loan, the processing fees, interest, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for the violations.

## COUNTS 3 & 4
## Violation of 31 U.S.C. § 3729(a)(1)(B)
## (Making or Using False Records or Statements)

102.   The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

103.   On or about April 3, 2020, and April 13, 2020, Defendants Joseph Rashid and Rashid Pharmacy knowingly submitted a PPP loan application that contained misrepresentations regarding the intended use of PPP funds.

104.   On or about June 30, 2021, Defendant Joseph Rashid and Rashid Pharmacy subsequently knowingly submitted a PPP forgiveness application that misrepresented their use of the PPP funds and eligibility for loan forgiveness.

105.   Specifically, on the initial loan application, they falsely certified the following:

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

JR — Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

JR — The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

106.     Specifically, on the loan forgiveness application, they certified the following:

The dollar amount for which forgiveness is requested (which does not exceed the principal amount of the PPP loan):
- was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures);
- includes payroll costs equal to at least 60% of the forgiveness amount; and
- for any owner-employee (with an ownership stake of 5% or more) or self-employed individual/general partner, does not exceed 2.5 months' worth of compensation received during the year used to calculate the PPP loan amount, capped at $20,833 per individual in total across all businesses.

107.     By virtue of these false statements, the United States was damaged for the full amount of the loan, the processing fees paid, interest, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each violation.

## COUNTS 5 & 6
## Violation of 31 U.S.C. § 3729(a)(1)(A), (C)
## (Presenting or Causing to be Presented False and Fraudulent Claims, Conspiracy)

108.     The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

109.     On or about April 3, 2020, and April 13, 2020, Defendants Joseph Rashid, Canda Rashid, and Rashid Delivery knowingly requested and obtained a PPP loan and used the funds for an unapproved purpose, in violation of the PPP Rules.

110.   On or about December 12, 2020, Defendants Joseph Rashid, Canda Rashid, and Rashid Delivery knowingly requested and received forgiveness for this PPP loan despite their failure to comply with the PPP Rules.

111.   Joseph Rashid, Canda Rashid, and Rashid Delivery presented two false claims to the United States, through its agency the SBA, for payment: its initial loan application for PPP loan proceeds and its loan forgiveness application to avoid repayment of the PPP loan proceeds.

112.   Specifically, on the initial loan application, they certified the following:

CERTIFICATIONS
The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

CR   Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

CR   The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

113.   On the loan forgiveness application, they certified the following:



The dollar amount for which forgiveness is requested:
- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);
- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;
- includes payroll costs equal to at least 60% of the forgiveness amount;
- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and
- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

114.   By virtue of these false claims, the United States was damaged for the full amount of the PPP loan, the processing fees, interest, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for the violations.

## COUNTS 7 & 8
## Violation of 31 U.S.C. § 3729(a)(1)(B), (C)
## (Making or Using False Records or Statements, Conspiracy)

115.   The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

116.   On or about April 3, 2020, and April 13, 2020, Defendants Joseph Rashid, Canda Rashid, and Rashid Delivery knowingly submitted a PPP loan application that contained misrepresentations regarding the intended use of PPP funds.

117.   Specifically, on the initial loan application, they certified the following:

118.   On or about December 12, 2020, Defendant Joseph Rashid, Canda Rashid, and Rashid Delivery subsequently knowingly submitted a PPP forgiveness application that misrepresented their use of the PPP funds and eligibility for loan forgiveness.

119.   Specifically, on the loan forgiveness application, they falsely certified the following:

 The dollar amount for which forgiveness is requested:
- was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);
- includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;
- includes payroll costs equal to at least 60% of the forgiveness amount;
- if a 24-week Covered Period applies, does not exceed 2.5 months' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $20,833 per individual; and
- if the Borrower has elected an 8-week Covered Period, does not exceed 8 weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.

120. By virtue of these false statements, the United States was damaged for the full amount of the loan, the processing fees paid, interest, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each violation.

## COUNT 9
### Violation of 31 U.S.C. § 3729(a)(1)(A)
### (Presenting or Causing to be Presented False and Fraudulent Claims)

121. The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

122. Defendants Joseph Rashid and Rashid Pharmacy knowingly applied from and received a PRF payment and used the funds for an unapproved purpose, in violation of the PRF authorizing statutes and program Terms and Conditions.

123. On or about June 15, 2020, Rashid and Rashid Pharmacy presented false claims to the United States, actively attesting to the Terms and Conditions of the PRF funds. This included a false certification that the funds "will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus." Additionally, later, through their accountant,

Rashid and Rashid Pharmacy submitted a report certifying that they had used the PRF funds for approved purposes, thus allowing them to retain the funds.

124.    By virtue of these false claims, the United States was damaged for the full amount of the PRF funds, $407,186.49, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for the violations.

## COUNT 10
### Violation of 31 U.S.C. § 3729(a)(1)(B)
### (Making or Using False Records or Statements)

125.    The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

126.    Defendants Joseph Rashid and Rashid Pharmacy knowingly received a PRF payment and used the funds for an unapproved purpose, in violation of the PRF rules.

127.    On or about June 15, 2020, Rashid and Rashid Pharmacy presented false claims to the United States, actively attesting to the Terms and Conditions of the PRF funds.  This included a false certification that the funds "will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus."  Additionally, later, through their accountant, Rashid and Rashid Pharmacy submitted a report certifying that they had used the PRF funds for approved purposes, thus allowing them to retain the funds.

128.    By virtue of these false statements, the United States was damaged for the full amount of funds received, $407,186.49, plus any other costs or interest, and is entitled to treble damages under the FCA, plus civil penalties for each violation.

**COUNTS 11 through 43**
**Violations of 21 U.S.C. § 842(a)(5)**
**(Civil Penalties for Failing to Keep Accurate Records)**

129.    The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

130.    Joseph Rashid and Rashid Pharmacy are DEA-registered dispensers and subject to the requirements of Part C of the CSA.  21 U.S.C. § 822.

131.    Pursuant to 21 U.S.C. §§ 842(a)(5), 827(a)(3), 21 C.F.R. §§ 1304.21, 1304.22, and 28 C.F.R. § 85.5, Rashid and Rashid Pharmacy are liable to the United States for penalties of up to $19,246 per violation for failing to keep accurate records of the following controlled substances manufactured, received, sold, delivered, or otherwise disposed of:

| COUNT | RX NUMBER | MEDICATION | PATIENT | PILLS FOUND |
|---|---|---|---|---|
| 11 | 2060714 | Oxycodone HCL | P.M. | 30 |
| 12 | 2060521 | Oxycodone HCL | C.S. | 60 |
| 13 | 2060548 | Oxycodone HCL | L.H. | 240 |
| 14 | 2060677 | Oxycodone HCL | F.Z. | 120 |
| 15 | 2061753 | Hydrocodone | H.T. | 90 |
| 16 | 2060955 | Oxycodone HCL | K.F. | 90 |
| 17 | 2061046 | Hydrocodone-acetaminophen | R.M. | 30 |

| 18 | 2061316 | Oxycodone HCL | L.L. | 60 |
|----|---------|---------------|------|-----|
| 19 | 2061032 | Oxycontin | M.K. | 30 |
| 20 | 2061040 | Hydrocodone-acetaminophen | M.C. | 60 |
| 21 | 2061116 | Oxycodone HCL | M.M. | 60 |
| 22 | 2061666 | Hydromorphone | M.M. | 60 |
| 23 | 2061593 | Hydromorphone | M.M. | 90 |
| 24 | 2061266 | Hydrocodone-acetaminophen | A.L. | 60 |
| 25 | 2061067 | Hydrocodone-acetaminophen | P.F. | 30 |
| 26 | 2061513 | Hydrocodone-acetaminophen | T.M. | 90 |
| 27 | 2061235 | Oxycodone HCL | R.B. | 60 |
| 28 | 2061287 | Hydrocodone-acetaminophen | A.S. | 20 |
| 29 | 2061312 | Hydrocodone-acetaminophen | M.O. | 58 |
| 30 | 2061288 | Hydrocodone-acetaminophen | M.M. | 30 |
| 31 | 2061323 | Hydrocodone-acetaminophen | S.J. | 60 |
| 32 | 2061295 | Oxycodone HCL | J.H. | 90 |
| 33 | 2061341 | Hydrocodone-acetaminophen | J.H. | 30 |
| 34 | 2061695 | Hydrocodone-acetaminophen | K.D. | 30 |
| 35 | 2061324 | Oxycodone-acetaminophen | L.B. | 30 |
| 36 | 2061360 | Hydrocodone-acetaminophen | D.C. | 60 |
| 37 | 2062123 | Oxycodone HCL | D.C. | 30 |
| 38 | 2061467 | Oxycodone HCL | M.D. | 55 |
| 39 | 2062094 | Hydrocodone-acetaminophen | J.H. | 30 |

| 40 | 2061372 | Hydrocodone-acetaminophen | J.K. | 30 |
|---|---|---|---|---|
| 41 | 2061551 | Morphine sulfate | D.M. | 30 |
| 42 | 2061765 | Hydrocodone-acetaminophen | A.M. | 30 |
| 43 | 2062150 | Hydrocodone-acetaminophen | R.B. | 30 |

132.   Rashid certified on his "destruction log" that each of the above-noted controlled substances had been destroyed.  But, the drugs were discovered, during the March 2021 search warrant, in Rashid's personal office.

## COUNT 44 – Payment By Mistake

133.   The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

134.   This is a claim for the recovery of monies the United States paid directly or indirectly to Defendants as a result of mistaken understandings of fact.

135.   The United States' mistaken understandings of fact were material to its decision to approve and then forgive the PPP loans and also allow Defendants to keep the PRF funds.

136.   The United States, acting in reasonable reliance on the truthfulness of the statements contained in the PPP loan and PRF payment applications, approved two loans and one payment to Defendants for unapproved expenditures.

137.   The United States, acting in reasonable reliance on the truthfulness of the statements contained in the PPP loan and PRF payment applications, forgave, or

partially forgave, the PPP loans and PRF payment when they were not eligible for forgiveness.

138.    Thus, the United States is entitled to recoup the amount of the PPP loans and PRF payment plus any other amounts to be determined at trial.

<b>COUNT 45 – Unjust Enrichment</b>

139.    The United States of America re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

140.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched at the expense of the United States.

141.    By obtaining from the United States funds to which they were not entitled, Defendants were unjustly enriched and the United States is entitled to damages in an amount of $987,486.49, together with any other damages to be determined at trial.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE the United States of America respectfully requests that this Court enter judgment as follows:

(a) Against Joseph Rashid, Canda Rashid, Rashid Delivery, and Rashid Pharmacy in the amount of the loan/payment the subject of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than $14,308.00 or more than $28,619.00 per claim as provided by 31 U.S.C. § 3729(a), 20 C.F.R. Part 356 and 28 C.F.R. Part 85 (*see* 90 FR 29445, July 3, 2025), to the extent such multiplied penalties shall fairly

compensate the United States of America for damages resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery for, trebled, plus contractual interest to be proven at trial;

(b) Against Defendants for unjust enrichment and payment by mistake, awarding the United States of America the amount by which the Defendants were unjustly enriched and mistakenly paid;

(c) Against Jospeh Rashid and Rashid Pharmacy on Counts 11 through 43, civil penalties assessed as appropriate under 21 U.S.C. § 842(a)(5) and 28 C.F.R. 85.5, up to $19,246 per violation;

(d) The United States of America's reasonable costs, post-judgment interest, and filing fees in this action; and

(e) Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

David C. Waterman
United States Attorney

By:   */s/ Kristin M. Herrera*
Kristin M. Herrera
Assistant United States Attorney
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Telephone: (515) 473-9300
Facsimile: (515) 473-9282
Email: kristin.herrera@usdoj.gov